United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD SOLORZANO RENTERIA,

    Petitioner,

    v.

ROBERT AYERS, JR., Warden,

    Respondent.
_____/

No. C-08-5237 TEH (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

Petitioner, a state prisoner incarcerated at Corcoran State Prison, has filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging the California Board of Parole Hearings' ("B.P.H.") refusal to grant him parole at his second parole hearing held on March 6, 2007. Doc. #1-1; Doc. #1-2; see Doc. #1-1 at 8 & 26. On April 1, 2009, the Court issued an Order to Show Cause why the writ should not be granted. Doc. #3. On June 1, 2009, Respondent filed an Answer. Doc. #4. On June 19, 2009, Petitioner filed a Traverse. Doc. #5.

After the matter was submitted, on April 22, 2010, the Ninth Circuit issued its decision in Hayward v. Marshall, 603 F.3d

546 (9th Cir. 2010) (en banc), which addressed important issues relating to federal habeas review of BPH decisions denying parole to California state prisoners. On May 5, 2010, the Court ordered the parties to file supplemental briefing explaining their views of how the Hayward en banc decision applies to the facts presented in Petitioner's challenge to BPH's decision denying him parole. Doc. #9. Respondent filed supplemental briefing on May 28, 2010; Petitioner filed his on August 2, 2010. Doc. ## 11 & 15.

Having considered all of the papers filed by the parties, the Court DENIES the Petition.

I

In November 1994, Petitioner was convicted in Santa Clara County Superior Court of second degree murder and possession of a controlled substance and was sentenced to an indeterminate term of seventeen years to life in state prison. Doc. #4-1 at 25. At Petitioner's parole suitability hearing, BPH read two factual summaries into the record. The first, set forth below, derived from the probation officer's report of Petitioner's commitment offense.

> [Petitioner] and [the] victim, Valerie L. Renteria, were married and the parents of two children. During the first part of 1980, they were separated and residing apart. [Petitioner] was not welcome in his in-laws home where Valerie lived and reports indicate her parents opposed any reconciliation of Valerie and the defendant.
>
> On Friday, March 7, 1980, Valerie told friends with whom she had lunch and her brother, she was going to meet [Petitioner] and that he had a surprise for her. She had been speaking with friends about the possibility she and [Petitioner] would soon reconcile. She was

2

apparently planning to spend the weekend with [Petitioner], because she told her cousin she would not be at a reception on Saturday, as she was meeting [Petitioner].

That evening, the victim dropped off her children at her aunt's home, as they were to stay there for the weekend. On the morning of March 8th, 1980, [Petitioner] picked up her and the victim's two boys from the victim's aunt's home. The children stayed with him at his parents['] home until he returned them to the home of their maternal grandparents on the evening of Sunday March 9th, 1980. Among the children's clothing he brought back with them was the victim's panty girdle. [When] Valerie did not return home and on March 10th, 1980, a missing person's report was filed.

Co-workers of the victim told police the victim had been excited on Friday March 7, because she was going to meet [Petitioner] and talk about a reconciliation. When she did not report to work the following Monday, they just assumed she was with [Petitioner]. Friends from [the victim's] employment told the police the victim had had lunch with them Friday during which she had spoken of her plans to meet [Petitioner] that evening. [Petitioner] reported to police he and the victim had gone to lunch on Friday, March 7th, and she had told him she was going away with friends for the weekend. He advised she had told him the children would be at her aunt's home and had given him directions to the home where he could pick them up.

On March 28th, 1980, a private detective advised police two checks on the victim's checking account had been returned by the bank with irregular signatures. Both checks had been made out to cash, one dated March 6th, 1980, was for 100 dollars and the other dated March 7th, 1980, was for 150 dollars. [Petitioner] had cashed them at a liquor store on March 10th, 1980. He explained Valeri[e] had given him the checks on the Monday or Tuesday prior to her disappearance and that she had postdated them because he normally pays his bills on Friday. He had needed the money to pay bills. He admitted he was in arrears in the amount of 9,000 dollars for child support and that his wages were being garnished 69 dollars per

3

> paycheck for this.
>
> A handwriting expert determined the victim did not sign the checks, but that they were signed by [Petitioner] in an attempt to copy the victim's signature. [Petitioner] was interviewed on March 12th, 1980, and advised police he had seen the victim at her place of employment on March 7, 1980. There she told him she was spending the weekend with friends and that her children would be at her aunt's home. He volunteered to take care of their children and she provide[d] him with directions to where they would be staying. He reported he had spent the evening of March 7th, at his brother Gary's home, where they had played cards. [Petitioner] had then stayed the night there until he left to pick up his boys from Valerie's aunt's home.
>
> His brother subsequently confirmed [Petitioner] had been at his home the evening and night of the victim's disappearance. The victim's aunt advised police the victim had been excited the evening she had dropped the children off at her home. She explained the victim had indicated she and [Petitioner] were going out to dinner and dancing together. The victim had told her aunt the defendant would be picking up the children the next morning.
>
> Ms. Emma Reynosa, . . . a friend of the victim reported to police the victim had told her she was going to spend the weekend with [Petitioner]. Previously, the victim had confided in her the fact [Petitioner] had beaten her after an argument while she was pregnant with her youngest child. Also, approximately two months prior to her disappearance, the victim had advised Ms. Reynosa that some of her dresses in her closet had been cut with a razor blade or something. The victim told Ms. Reynosa [Petitioner] had done it. Ms. Reynosa additionally stated [Petitioner] had tried to force himself on Valerie's younger sister and female friends of the victim.
>
> On June 9, 1980, the resident of 399 Gray Ghost in San Jose telephoned police and reported finding a human skull in the storage shed in the backyard. The skull was sitting on top of a mattress. Some teeth and the lower jaw was missing from the skull. Nothing further was found in the backyard.

4

On June 15, 1980, the resident at 399 Gray Ghost reported to police a human jawbone had been found in the middle of the backyard. Some teeth were missing from the jawbone that proved to match the skull found at the same address six days earlier. . . .

On August 29, 1980, a man was walking northbound on the southbound shoulder of Highway 101, approximately three-fourths to one mile south of the Hilyer Overpass. He found a printed circuit board and began to search the area further when he noticed an orange sheet of plastic behind a tree approximately 20 to 30 feet from where he was. His investigation revealed a decomposed foot sticking out from under the cloth. The body proved to be that of a female whose head was missing. Loose teeth found with the body perfectly fit into the skull and jawbone found in June at 399 Gray Ghost. Dental records revealed the body was that of the victim, Valerie Renteria.

A review of this unsolved case was done by investigators in the District Attorney's Office during May of 1993. They realized that although [Petitioner's] brother Gary had told police [Petitioner] had spent the night of the victim's disappearance at his home, Gary's wife was never interviewed to confirm this. During an interview with her, Olivia Soria, . . . told investigators she and Gary divorced in 1990. She also advised police [Petitioner] never stayed the night at she and Gary's home prior to several months after Valerie's disappearance. She was not aware that Gary had ever been questioned by the police at the time this occurred.

On May 14th, 1993, Gary Renteria was interviewed at his place of employment. He again stated [Petitioner] had spent the night the victim disappeared at his home. When confronted with the statement made by his ex-wife that this was not true, Mr. Gary Renteria admitted what his ex-wife [said] was true. He explained that his brother, [Petitioner], had told him to tell anyone who asked that [he] had spent the night in question playing cards at his home.

After the investigators interviewed Gary Renteria, the[y] decided that Gary may inform

5

>   [Petitioner] of the contents of the discussion.
>   Fearing [Petitioner] would flee, a complaint was
>   issued against him. Investigators went to his
>   home and arrested him. In the front pocket of
>   the shorts he was wearing was a vial containing
>   a white powder substance which proved to be
>   methamphetamine. [Petitioner] was booked into
>   county jail.

Doc. #4-1 at 34–41.

Petitioner's version of the commitment offense, set forth below, is taken from a January 25, 2007 letter he wrote to his correctional counselor.

>   This is in response to your request for my
>   version of events in regards to my case. I'm
>   not going to go into any details about the case,
>   because of the misleading information that is
>   being perpetuated by the District Attorney's
>   office as to the [cause] of death. The District
>   Attorney has access to all the court transcripts
>   and if he would take the time to review them, he
>   would see that Richard T. Mason, M.D., along
>   with John E. Houser, M.D., from the Santa Clara
>   County Office[] of the Coroner[] both could not
>   determine the cause of death.
>
>   Furthermore, both Dr. Mason and Dr. Houser
>   testified under oath that the cause of death was
>   not because of stabbing, strangulation,
>   shooting, beating or decapitation. This is why
>   I'm attaching a copy of the death certificate,
>   which is a legal and binding document which
>   clearly states that the cause of death is
>   undetermined. The District Attorney will not do
>   this, because it would constitute him reopening
>   my case, which he can't do and the Board can't
>   do.
>
>   I accept full responsibility for my
>   actions. If I could turn back the hands of time
>   and change what happened, I would, but I can't.
>   I regret the pain and suffering I have caused to
>   all concerned and I feel great remorse and
>   humility for my actions and I'm sorry. I'm
>   [d]oing everything possible to rehabilitate
>   myself and I strive to become a better man in
>   the eyes of God and to my fellow women and men.

> This Board hearing is not about reopening my case. It's supposed to be about determining my suitability for parole based upon how I have conducted myself in prison and about which steps I have taken to turn my life around and rehabilitate myself so that I can become a more active and productive member of society and to help others in making the right choices in life so that they do not end up devastating their lives or the lives of others.

Doc. #4-1 at 41–43.

BPH ultimately concluded that Petitioner was not yet suitable for parole and would pose a current unreasonable risk of danger to society or threat to public safety if released from prison. Doc. #4-2 at 72. After he was denied parole, Petitioner filed a petition for writ of habeas corpus in Santa Clara County Superior Court, which was denied on April 18, 2008. Doc. #4-3 at 2–3. The California Court of Appeal summarily denied a petition filed there on August 21, 2008. Doc. #4-6 at 2. The California Supreme Court summarily denied his Petition for Review on October 16, 2008. Doc. #4-8 at 2. The instant federal Petition for a Writ of Habeas Corpus followed. Doc. #1.

II

In <u>Hayward</u>, the Ninth Circuit explained the law in California as it relates to parole suitability determinations:

> The California parole statute provides that the Board of Prison Terms "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." The crucial determinant of whether

7

> the prisoner gets parole in California is "consideration of the public safety."
>
> In California, when a prisoner receives an indeterminate sentence of fifteen years to life, the "indeterminate sentence is in legal effect a sentence for the maximum term, subject only to the ameliorative power of the [parole authority] to set a lesser term." Under the California parole scheme, the prisoner has a right to a parole hearing and various procedural guarantees and rights before, at, and after the hearing; a right to subsequent hearings at set intervals if the Board of Prison Terms turns him down for parole; and a right to a written explanation if the Governor exercises his authority to overturn the Board of Prison Terms' recommendation for parole. Under California law, denial of parole must be supported by "some evidence," but review of the [decision to deny parole] is "extremely deferential."

Hayward, 603 F.3d at 561-62 (footnotes and citations omitted).

The court further explained that:

> [s]ubsequent to Hayward's denial of parole, and subsequent to our oral argument in this case, the California Supreme Court established in two decisions, In re Lawrence . . . and In re Shaputis, . . . that as a matter of state law, "some evidence" of future dangerousness is indeed a state sine qua non for denial of parole in California. We delayed our decision in this case so that we could study those decisions and the supplemental briefs by counsel addressing them. As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." . . . There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." . . . The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. . . . Thus, in California, the offense of conviction may be considered, but the consideration must address

8

> the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes and citations omitted).

After providing this background on California law as it applies to parole suitability determinations, the court then explained the role of a federal district court charged with reviewing the decision of either BPH or the governor in denying a prisoner parole. According to the Ninth Circuit, this Court must decide whether a decision "rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (citations omitted); see also Cooke v. Solis, 606 F.3d 1206, 1208, n. 2 & 1213 (9th Cir. 2010) (applying Hayward and explicitly rejecting the state's argument that "the constraints imposed by [the Antiterrorism and Effective Death Penalty Act ("AEDPA")] preclude federal habeas relief" on petitioner's claim; noting that in Hayward, the court "held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas review under AEDPA").

III

When assessing whether the California parole board's suitability determination was supported by "some evidence," this Court's analysis is framed by the "regulatory, statutory and constitutional provisions that govern parole decisions in California." Cooke, 606 F.3d at 1213 (citing In re Rosenkrantz, 29

Cal. 4th 616 (2002)); see Hayward, 603 F.3d at 561-62.  Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute.  In re Dannenberg, 34 Cal. 4th 1061, 1069-70 (2005).  Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. 15, § 2402(a).  In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release.  See Cal. Code Regs. tit. 15, § 2402(b)-(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner."  Cal. Code Regs. tit. 15, § 2402(c)(1).  The factors to be considered in making that determination include:  "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

10

According to the California Supreme Court, "the core statutory determination entrusted to the Board and the Governor [in determining a prisoner's parole suitability] is whether the inmate poses a current threat to public safety . . . ." In re Lawrence, 44 Cal. 4th 1181, 1191 (2008). And, "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Id. at 1205 (emphasis in original) (citing Rosenkrantz, 29 Cal. 4th 616 & Dannenberg, 34 Cal. 4th 1061). The court further explained that:

> a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." . . . These factors are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate.

Lawrence, 44 Cal. 4th at 1205-06 (citations omitted). The relevant inquiry, therefore, is:

> whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

In re Shaputis, 44 Cal. 4th 1241, 1254-55 (2008).

The evidence of current dangerousness "must have some indicia of reliability." In re Scott, 119 Cal. App. 4th 871, 899 (2004) (Scott I). Indeed, "the 'some evidence' test may be

11

understood as meaning that suitability determinations must have some rational basis in fact." In re Scott, 133 Cal. App. 4th 573, 590, n. 6 (2005) (Scott II); see also Cooke, 606 F.3d at 1216 (holding that the state court decision upholding the denial of parole was "'"based on an unreasonable determination of the facts in light of the evidence[],"' Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2))," and therefore finding petitioner entitled to habeas relief because "[n]othing in the record supports the state court's finding that there was 'some evidence' in addition to the circumstances of the commitment offense to support the Board's denial of petitioner's parole").

IV

After careful review of the law and the evidence, and as set forth below, this Court cannot say that the state court's approval of BPH's decision to deny Petitioner parole was an unreasonable application of the California "some evidence" standard, nor that it was based on an unreasonable determination of the facts in light of the evidence. See Hayward, 603 F.3d at 563.

As an initial matter, the record shows that, at Petitioner's March 6, 2007 parole suitability hearing, BPH afforded Petitioner and his counsel an opportunity to speak and present Petitioner's case, gave them time to review documents relevant to Petitioner's case and provided them with a reasoned decision in denying parole. Doc. #4-1 at 32-34; Doc. #4-2 at 61-66 & 72-84. The record also shows that BPH relied on several circumstances tending to show unsuitability for parole and that these

12

circumstances formed the basis for its conclusion that Petitioner was not yet suitable for parole and would pose a current unreasonable risk of danger to society or threat to public safety if released from prison.  Doc. #4-2 at 72-84; see Lawrence, 44 Cal. 4th at 1191, 1205; Cal. Code Regs. tit. 15, § 2402(a) (stating that a prisoner determined to be an unreasonable risk to society shall be denied parole).

> BPH explained its decision as follows:
>
> The victim was defiled and mutilated. We're not sure if that was during or after the offense in that by the time that authorities found the victim, the skeletal remains were basically in pieces.
>
> . . . .
>
> The murder of the victim did not deter [Petitioner] from later committing other criminal offenses. And, specifically, again, the death of Mrs. Renteria occurred back in 1980 . . . and [there was an] assault to commit rape [in] July of 1984 and sexual battery, with serious bodily injury where . . . [Petitioner] pled and was convicted of false imprisonment, assault with a deadly [weapon], not a firearm, with great bodily injury likely where he did receive jail and probation. And then followed by in 1988, in April, he was arrested for two counts of battery. He was convicted of one count of battery and received two years probation, fine and restitution.
>
> . . . .
>
> We find that [Petitioner] does have a record of violence and somewhat assaultive behavior. And again, this goes to his . . . adult arrests and convictions. The three that we have on record, besides the life crime, all had . . . some type of assaultive nature to it [sic]. . . . the first one in '77 was assault, battery[,] disturbing the peace, misdemeanor drunk driving. Then the second one, arrested for assault to commit rape and then . . . [the] battery and then you've got the life crime. So,

> one could say that there was a somewhat escalating pattern of criminal conduct depending on how you take a look at the series of events that occurred.
>
> [W]e find that he does have a history of somewhat tumultuous relationships with others. And this was really based on our discussion with [Petitioner] where he did relay to the Panel, especially when we were discussing anger and temper, et cetera, and propensity towards acting out violently, that he did relay the information that he was in many, many fights starting back when he was in high school and that's one of the reasons why he had joined the Marines was to get away from [the] sort of environment that he was surrounded by and getting into fights all the time. But he also admitted that he also continued to get into fights even within the Marine Corps.
>
>     He has failed previous grants of probation. He's failed to profit from society's previous attempts to correct his criminality. Such attempts include fines, adult probation and county jail. And we find that he does have somewhat of an unstable social history in that he was an abuser of alcohol and drugs. And specifically the drugs were his use of methamphetamine. And again, one of his first arrests happened to be for drunk driving and all the other instances that he relayed, well, ["]I was drunk, I was drunk.["]
>
> . . . .
>
> We find that the psychological report . . . is somewhat unfavorable and not supportive of release. . . . [The report notes that] "[t]aking into consideration[] the antisocial personality traits identified in [Petitioner], resumption of either alcohol or methamphetamine would be of further concern to this interviewer if he were released into the community."
>
>     And I do want to add this in regarding [Petitioner's] level of insight and remorse, that [he] did describe himself as a cold person who kept people at a distance and that he admits to having been impulsive and unable to accept criticism. And we did have a little discussion about that. However, . . . this psychological [evaluation] states he's currently at a mild

14

> risk for violent behavior, provided he remains
> abstinent from drugs and alcohol.

Doc. #4-2 at 72-77; see id. at 80-83. BPH noted Petitioner had attended at least seventy self-help programs in the last three years, but noted that:

> sometimes it's not quantity, it's the quality of
> the things that you're doing. Because it's your
> job to prove . . . to any Panel and everybody
> involved in these hearings that you are a
> changed person. And . . . this Panel did not
> see that today, in light of you spending the
> time [attending self-help programs]. So, . . .
> you're commended because you have attended a
> lot, but we really have not seen the results of
> your attendance . . . .

Doc. #4-2 at 78.

In addition to commending Petitioner for the number of self-help programs he attended, BPH acknowledged that Petitioner was disciplinary-free and had marketable skills, and had parole plans that included a place to live and possible employment. Doc. #4-2 at 79 & 81. BPH recommended that Petitioner remain disciplinary-free, continue to upgrade educationally and vocationally and continue to participate in self-help programming, but in a "more meaningful" way. Id. at 83.

After reviewing the petition filed in superior court challenging BPH's decision to deny Petitioner parole, the court found that "sufficient evidence supports the parole denial."[1]  See

---

[1] Here, the state appellate courts summarily denied Petitioner relief; the state superior court was the highest state court to address the merits of Petitioner's claim in a reasoned decision. It is that decision, therefore, that the Court analyzes. See LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000); Williams v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004) (federal court may look to any

15

Doc. #4-3 at 2. Specifically, the court noted the "uncontroverted evidence" that the victim's body was "defiled and mutilated[,]" that Petitioner's "other criminal activity still weighs against him[,]" and that BPH's "concerns about Petitioner's alcoholism are supported by some evidence." Id. at 3. The court concluded "[t]hese reasons are substantial enough to require that the Court affirm [BPH's] decision." Id.

Based on the entire body of evidence presented at Petitioner's March 6, 2007 parole suitability hearing, which included evidence of Petitioner's history of violence and assaultive behavior and tumultuous relationships, his failures to profit from society's previous attempts to correct his violent criminality, and history of substance abuse, the Court cannot say that the state court's approval of BPH's decision to deny Petitioner parole was an unreasonable application of the California "some evidence" standard, nor that it was based on an unreasonable determination of the facts in light of the evidence. See Hayward, 603 F.3d at 563; Cal. Code Regs. tit. 15, § 2402(b)-(d). Petitioner therefore is not entitled to federal habeas relief.

The Court reaches this conclusion in spite of the superior court's observation that ". . . the Board may well have erred in using Petitioner's invocation of his right not to discuss the crime against him, and in discounting Petitioner's marketable skills, support through the Veterans Administration, and multiple offers of

---

lower state court decision that was examined, and whose reasoning was adopted, by the highest state court to address the merits of a petitioner's claim).

16

residence. Doc. #4-3 at 2. Even if BPH "erred" Petitioner still would not be entitled to federal habeas relief because there was "some evidence" that Petitioner was not yet suitable for parole and would pose a current unreasonable risk of danger to society or threat to public safety if released from prison. See Hayward, 603 F.3d at 563; Lawrence, 44 Cal. 4th at 1191, 1205; Cal. Code Regs. tit. 15, § 2402(a).

V

For the foregoing reasons, the Petition for a Writ of Habeas Corpus is DENIED. Further, a Certificate of Appealability is DENIED. See Hayward, 603 F.3d at 554-55. Petitioner has failed to make "a substantial showing of the denial of a constitutional right." Id. (citing 28 U.S.C. § 2253(c)(2)). Nor has Petitioner demonstrated that his claim is "debatable among reasonable jurists." See Hayward, 603 F.3d at 555.

The Clerk of Court shall terminate all pending motions as moot, enter judgment in accordance with this Order and close the file.

IT IS SO ORDERED.

DATED  08/30/10

THELTON E. HENDERSON
United States District Judge

G:\PRO-SE\TEH\HC.08\Renteria-08-5237-bph denial-post hayward.wpd

17